

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EMR:RAS/MRG
F. #2017R01784

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 27, 2022

**TO BE FILED UNDER SEAL**

By ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Marina Golfo
                 Criminal Docket No. 19-95 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in opposition to the defendant Marina Golfo's motion for a reduced sentence under Title 18, United States Code, Section 3582(c)(1)(A). (See Mot. to Reduce Sentence, ECF No. 146 ("Def. Mot.")). For the reasons set forth herein, the Court should deny the motion.

      I.    Background

          A.  Procedural History

      On July 7, 2021, the defendant pleaded guilty before Your Honor to Count Two of a two-count indictment, which charged the defendant with healthcare fraud in violation of 18 U.S.C. § 1347(a). (Presentence Investigation Report ("PSR") ¶ 1). The defendant faced a United States Sentencing Guidelines ("Guidelines") range of 33 to 41 months' in custody. (See Ex. A, Sentencing Tr. at 32:12-17). On May 6, 2022, the Court significantly downwardly departed from that Guidelines range and sentenced the defendant to three months' in custody. (Ex. A. at 36:23-45:16). In rendering that sentence, the Court took into account several factors, including the defendant's family circumstances on which the defendant now seeks to rely in seeking a reduction to her three-month sentence.

B. Factual Background

1. Early Intervention Program

The New York State Early Intervention Program ("EIP") is a New York State program that provides remedial services to developmentally delayed children from birth to age three. (PSR ¶ 6). These services include physical therapy, occupational therapy, speech therapy, special instruction, and social work services, and are provided by individual therapists who are either subcontractors or employees of agencies that hold contracts with the New York State Department of Health. (Id.). In New York City, the New York City Department of Health and Mental Hygiene administers the EIP program under the ultimate oversight of the New York State Department of Health. (Id.). EIP therapists are required to submit written reports, known as session notes, that document their therapy sessions in order to receive payment for those sessions. (Id. ¶ 7). These session notes include, among other things, the date, time and place of a session, as well as information about the therapy administered and the child's progress; the session notes need to be signed by the therapist and parent or guardian of the child immediately after the conclusion of a session. (Id.). After submitting these session notes, EIP therapists are paid by their EIP agencies, which are in turn reimbursed by either private insurance, Medicaid or the New York City Department of Health and Mental Hygiene. (Id. ¶ 8).

2. The Defendant's Criminal Conduct

The Federal Bureau of Investigation and the New York City Department of Investigation conducted an investigation into allegedly fraudulent billing practices in which EIP therapists submitted session notes for non-existent or significantly abridged EIP therapy sessions. (PSR ¶ 3).

During the course of the investigation, law enforcement determined that the defendant submitted session notes for more than 1,500 non-existent EIP therapy sessions between approximately April 2015 and September 2018. (Id. ¶ 10). The defendant's years-long pattern of fraud resulted in the improper disbursement of more than $146,000 in New York City Department of Health and Mental Hygiene funds and more than $10,000 in Medicaid funds (id.), as well as lost time and resources for the victim children and their parents.

During the course of the investigation, law enforcement identified at least 500 instances in which historical location data for the defendant's cellular telephone reflected that she was not in the vicinity of the EIP therapy session location at the time she claimed to be performing such a session. (Id. ¶ 11). Law enforcement also reviewed license plate recognition ("LPR") records for a vehicle registered to the defendant and determined that on at least 50 occasions, the defendant submitted an invoice for a therapy session when the LPR records reflected that her vehicle was not in the vicinity of the purported session. (Id. ¶ 12). Law enforcement officers also interviewed parents, guardians, teachers and daycare providers (the "Caregiver") of children to whom the defendant claimed to provide EIP therapy sessions. (Id. ¶ 13). Those interviews revealed at least 60 occasions in which the defendant claimed to perform an EIP therapy session, but the Caregiver stated the session had not occurred as billed,

2

including numerous instances in which the Caregiver indicated that their purported signature on the session note submitted by the defendant for the therapy session was forged. (Id.). Law enforcement further reviewed records related to the defendant's use of her cellular telephone and identified at least 800 instances in which the defendant was on the telephone for at least a quarter of the time period that she claimed to be performing an EIP therapy session. (Id. ¶ 11).[1]

The government's evidence also demonstrates, more specifically, that the defendant was engaged in a variety of non-therapeutic activities during times that she purported to be serving clients and for which she submitted invoices requesting payment. (PSR Addendum ¶ 13A). For example, there were instances in which the defendant claimed on session notes to have provided EIP therapy and instead was: (i) at sporting events, including the U.S. Open and baseball games; (ii) at the gym; (iii) traveling or on vacation, including, for example on a trip to the North Fork; (iv) hiking at Kaaterskill Falls; or (v) out with friends at, for example, a bar or theater. (Id. ¶ 13A). In total, the defendant's actions resulted in at least 20 developmentally delayed children not receiving the EIP therapy sessions to which they were entitled. (PSR ¶ 10).

II. The Instant Motion

The defendant—having served less than three weeks of her sentence at the time of her filing—moves for a reduction in her sentence to time served and her immediate release from custody based on (i) her alleged medical conditions, (ii) the ongoing COVID-19 pandemic and (iii) family circumstances, each described further below.

III. The Bureau of Prison's Response to the COVID-19 Pandemic

The Bureau of Prisons ("BOP") has made extensive changes to its operations as a result of the COVID-19 pandemic, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and Prevention ("CDC") and the World Health Organization. Those efforts continue.

BOP's "action plan," described in detail at www.bop.gov/coronavirus/, called for several new procedures to protect against the risks of COVID-19. During the height of the pandemic, all newly arriving inmates were quarantined and not released into the general population until 14 days had passed and the inmate had tested negative; inmate movement within an institution was restricted in order to promote social distancing; mask wearing by inmates and staff was required; all facility staff were screened for symptoms daily; social visiting was suspended at nearly all institutions; and access by other outsiders was restricted to only those performing essential services, who were also screened before entry. When an outbreak did occur, any infected inmate was immediately quarantined, and all contacts

---

[1] While law enforcement cannot be sure whether on such occasions the defendant performed an abridged session or none at all, the length of the calls combined with the other evidence in the case suggests the latter. In any event, submitting session notes for a full session while performing an abridged session is improper.

(including entire housing units if warranted) were tested and quarantined as necessary, until all contacts returned at least two negative tests in a two-week period.

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP administers the COVID-19 vaccine in accordance with available guidance.  Vaccine doses are available at every BOP location for newly admitted and existing inmates and the BOP is committed to making the vaccine available to all staff and inmates who wish to receive it.  Inmates have also been offered booster shots in accordance with CDC guidance.

IV.     Legal Standard

"A Court may not modify a term of imprisonment once it has been imposed except pursuant to statute." United States v. Ogarro, No. 18-CR-373-9 (RJS), 2020 WL 1876300, at *2 (S.D.N.Y. Apr. 14, 2020).  The statute on which the defendant relies, commonly referred to as the "compassionate release" statute, 18 U.S.C. § 3582(c)(1)(A), provides a limited exception to the general rule that a court may not modify a term of imprisonment once it has been imposed.  In order for that limited exception to apply, a defendant must satisfy three requirements.  See United States v. Keitt, 21 F.4th 67, 71 (2d Cir. 2021).

"First, absent waiver or forfeiture by the government, an inmate must exhaust administrative remedies by requesting [compassionate release] from prison authorities." Id. In particular, a defendant generally must "fully exhaust[ ] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or wait until 30 days after "the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Second, a court must find that "extraordinary and compelling reasons" warrant a sentence reduction. Id. § 3582(c)(1)(A)(i). The passage of the First Step Act of 2018 "freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020). "[A] district court's discretion in this area—as in all sentencing matters—is broad." Id. "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" Id. at 237–38 (quoting 28 U.S.C. § 994(t)).

However, the Guidelines and BOP policy establish criteria to aid in a Court's determination of when a medical condition constitutes such a circumstance.  See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  In particular, the Guidelines provide

4

the following explanation of when "extraordinary and compelling reasons" may exist due to a defendant's medical condition:

> (A) <u>Medical Condition of the Defendant</u>.
>
>> (i) The defendant is suffering from a terminal illness (<u>i.e.</u>, a serious and advanced illness with an end of life trajectory) . . .
>>
>> (ii) The defendant is
>>
>>> (I) suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, Application Note 1; <u>see also</u> 28 U.S.C. § 994(t) (authorizing the Sentencing Commission to describe criteria that should be considered extraordinary and compelling reasons for sentence reduction).

Third, the court must consider "'the factors set forth in section 3553(a) to the extent that they are applicable' before it can reduce the defendant's sentence." <u>United States v. Jones</u>, 17 F. 4th 371, 374 (2d Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)).

"The defendant carries the burden of showing that [s]he . . . is entitled to a sentence reduction under the statute." <u>United States v. Garcia</u>, No. 09-CR-330 (KAM), 2021 WL 1616914, at *3 (E.D.N.Y. Apr. 26, 2021) (citation omitted). "Even if a defendant carries this burden, district courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." <u>Id.</u> (citation omitted).

V. <u>Analysis</u>

A. <u>Exhaustion of Administrative Remedies</u>

The defendant's letter seeking early release from the warden of FPC Alderson, where the defendant is housed, is dated September 6, 2022. Because 30 days has not passed since that submission, the defendant has not satisfied the exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A) and her application should be stayed to allow for the completion of

5

the BOP procedures. See Keitt, 21 F. 4th, 71 ("[A]n inmate may ask the sentencing court to consider reducing a sentence only after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility. . ."). Regardless, even if the Court considers the defendant's motion for a reduced sentence, the motion should be denied because the defendant has failed to demonstrate any extraordinary and compelling reason for a reduced sentence and the section 3553(a) factors weigh against releasing the defendant early in this case.

### B. The Defendant Has Not Demonstrated Extraordinary and Compelling Reasons to Reduce Her Sentence

The circumstances set forth in the defendant's application do not come close to establishing the requisite extraordinary and compelling reasons for a sentence reduction. The defendant argues that her sentence should be reduced because (i) ████████████████████████████████████████████, (ii) of the ongoing COVID-19 pandemic and (iii) her parents are elderly and unwell.

Although the defendant argues that COVID-19 "generated extraordinary and compelling circumstances that this Court could not have predicted at the time of sentencing," (Def. Mot. at 4), the defendant was sentenced in May of 2022, more than two years into the COVID-19 pandemic. At that time, the Court and the parties were fully aware of the challenges faced around the world and in correctional facilities as a result of the ongoing pandemic. Since the time of the defendant's sentencing, moreover, circumstances regarding COVID-19 have only improved within the prison system and throughout the country.

The defendant now alleges that she is at heighted risk because she was ████████████████████████████████████████████. (Def. Mot.). While the government does not minimize the risk that COVID-19 presents to inmates who have underlying medical conditions, there are only a narrow band of inmates for whom "extraordinary and compelling reasons" warrant immediate and permanent release. The defendant has not met her burden to show that her personal medical conditions rise to the level of an extraordinary and compelling reason. Moreover, according to the BOP's public records, as of the date of this filing, there are only three inmates currently positive for COVID-19 at Alderson FPC, where the defendant is housed. See https://www.bop.gov/coronavirus/.

The bulk of the medical records provided by the defendant relate to the health of the defendant's elderly parents. However, the defendant's family circumstances and the health of her parents was expressly and carefully considered by Your Honor at sentencing and were part of the Court's determination that a substantial downward departure from the Guidelines range was appropriate. (Ex. A at 25:16-23, 26:16-27:15, 39:18-40:10, 43:2-4, 45:3; see also id. at 17:9-23). A motion for compassionate release is not an opportunity to relitigate the defendant's arguments already addressed at sentencing. See United States v. Roney, 822 F. App'x 850, 854 (2d Cir. 2020) ("[A] compassionate-release motion is not an

6

opportunity to second guess or to reconsider the sentencing court's original decision." (internal quotation marks omitted)).

Congress has indicated that § 3582(c)(1) "applies to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." United States v. Traynor, No. 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). (quoting Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304). Here, the defendant's circumstances come nowhere close to meeting this standard and are not what the compassionate release statute is intended to address.

### C. The Defendant Fails to Show that Section 3553(a) Factors Warrant a Reduced Sentence

Beyond the absence of extraordinary and compelling reasons warranting compassionate release, the Court should deny the defendant's motion based on application of the relevant § 3553(a) factors. "[A] court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." United States v. O'Neil, No. 17-CR-444 (JMA), 2021 WL 1616915, at *1 (E.D.N.Y. Apr. 26, 2021). Review of the factors in the instant case "presents an insurmountable barrier to relief." United States v. Markou, No. 08-CR-339 (RJD), 2020 WL 6945923, at *2 (E.D.N.Y. Nov. 25, 2020).

The Section 3553(a) factors include, among other things the: (1) nature and circumstances of the offense, (2) history and characteristics of the defendant, (3) need for the sentence imposed to afford adequate deterrence to criminal conduct, and (4) need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense. See 18 U.S.C. § 3553(a).

As discussed in detail in the government's sentencing submission (ECF No. 134) and at the defendant's May 6, 2022 sentencing, the 3553(a) factors weigh heavily in favor of a custodial term and, with respect to the instant motion, weigh heavily against releasing the defendant from that term after less than a month.

The nature and "circumstances of the offense" are serious. The defendant submitted over one thousand fraudulent session notes, requesting and receiving payment for hundreds of hours of therapy sessions that she never provided. Her actions deprived developmentally delayed children of services they desperately needed to develop essential life skills. These children, all of whom were three years old or younger, were entitled to receive from the defendant Applied Behavior Analysis, or "ABA" therapy, which is an intensive therapy that helps special needs children develop fundamental skills such as learning to speak, making eye contact or developing basic motor skills. This therapy was critical to their development and because of the defendant's crime, they did not receive the level of care they

needed. The defendant's crime also resulted in the loss of over $150,000 that was designated to help this uniquely vulnerable population.

In one of the most disturbing instances, the defendant was tasked with providing an approximately six-month old child ("Victim-1") with four hours of ABA therapy five days per week. The amount of time of expected services alone is indicative of the severity of Victim-1's needs. The government has conservatively identified more than 400 hours of fraudulent session notes in connection with Victim-1 alone, which is the highest number of identified hours stolen of any identified victim. That is significant because Victim-1's mother was also disabled, demonstrating the depth and intentionality of the defendant's misconduct. She appeared to carefully select her victims, stealing the most time from the child of a disabled parent who was less able to protect her child against the defendant's criminal conduct.

Not only did the defendant show gross disregard for the needs of the children she was entrusted to help, but many of the hours that she was supposed to spend in service of those children, were instead spent catering to her own indulgences. She spent that time at the U.S. Open, at baseball and basketball games, at bars, taking classes at gyms, at a concert, hiking and jet-setting around the country. She traveled to the North Fork, Seattle, Burlington and North Carolina all while billing for providing therapy to disabled children.

The defendant's history and characteristics further weigh in favor of a Guidelines sentence. She engaged in her criminal conduct over a span of years, growing increasingly brazen over time. The families that she victimized faced the significant challenge of raising a child with special needs, and the defendant betrayed the trust that these families placed in her. Even after her arrest, the defendant showed a lack of remorse by failing to accept responsibility for her crimes until mere days before trial. As a result, many of her victims were forced to set aside significant time to assist in the preparation for trial and endure the stress and anticipation of testifying in federal court.

The defendant's life circumstances were already given significant consideration at sentencing. She received a three-month sentence, which was well below her Guidelines range of 33 to 41 months. At the time of her sentencing, the government argued that the defendant had repeatedly failed to fully take responsibility for her crimes, further harming her victims and wasting significant government resources. The Court also expressed concerns that the defendant had "not fully accepted responsibility for her criminal conduct." (Ex. A at 40:11-16). The defendant's current motion is just another example of the defendant's long pattern of refusing to take responsibility for her crimes.

    VI.    <u>Sealing</u>

The government respectfully requests that this letter be filed under seal, with a redacted version to be filed publicly, because it discusses the defendant's health. See <u>Offor v. Mercy Med. Ctr.</u>, 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common-law right of access and thus have sealed docket entries and redacted documents that

8

contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).

VII. Conclusion

For the reasons stated herein, the government respectfully submits that the Court should deny the defendant's motion for a reduced sentence.

Respectfully Submitted,

BREON PEACE
United States Attorney

By:    /s/Rachel A. Shanies
Rachel A. Shanies
Matthew R. Galeotti
Assistant United States Attorneys
(718) 254-6140/6340

cc: Clerk of the Court (KAM) (by ECF)
     Michael E. Vitaliano, Esq. (by ECF)